IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF FLORIDA
PENSACOLA DIVISION

CASSANDRA M. MILLIONDER,
       Plaintiff,

vs.                           Case No.: 3:13cv323/EMT

CAROLYN W. COLVIN,
Acting Commissioner of Social Security,
       Defendant.
_____/

## **MEMORANDUM DECISION AND ORDER**

This case, in which Plaintiff proceeds pro se and in forma pauperis, has been referred to the undersigned magistrate judge for disposition pursuant to the authority of 28 U.S.C. § 636(c) and Fed. R. Civ. P. 73, based on the parties' consent to magistrate judge jurisdiction (*see* docs. 10, 11).  It is now before the court pursuant to 42 U.S.C. § 405(g) of the Social Security Act ("the Act"), for review of a final decision of the Commissioner of the Social Security Administration ("the Commissioner of the SSA") denying Plaintiff's applications for disability insurance benefits ("DIB") under Title II of the Act, 42 U.S.C. §§ 401–34, and supplemental security income ("SSI") benefits under Title XVI of the Act, 42 U.S.C. §§ 1381–83.

Upon review, the court concludes that the findings of fact and determinations of the Commissioner are supported by substantial evidence and comport with proper legal principles.  The decision of the Commissioner therefore is affirmed.

I.      PROCEDURAL HISTORY

On June 2, 2010, Plaintiff filed applications for DIB and SSI, and in each application she alleged disability beginning March 25, 2008 (tr. 16).[1]  Her applications were denied initially and on reconsideration, and thereafter she requested a hearing before an administrative law judge ("ALJ"). The ALJ held a hearing on November 2, 2011, at which Plaintiff—who was represented by counsel—and a vocational expert ("VE") testified.  On November 21, 2011, the ALJ issued a decision in which he found that Plaintiff was "not disabled," as defined under the Act, at any time through the date of his decision (tr. 16–31).  The Appeals Council ("AC") denied Plaintiff's request for review on February 26, 2013 (tr. 6–8), but set that action aside on March 21, 2013, to consider new evidence before again denying the request for review (tr. 1–5).[2]  Thus, the decision of the ALJ stands as the final decision of the Commissioner, subject to review in this court.  Ingram v. Comm'r of Soc. Sec. Admin., 496 F.3d 1253, 1262 (11th Cir. 2007).  This appeal followed.

II.     FINDINGS OF THE ALJ

In his November 21, 2011, decision, the ALJ made the following findings (see tr. 16–31):

(a)      Plaintiff meets the insured status requirements of the Act through June 30, 2014[3];

---

[1] All references to "tr." refer to the transcript of Social Security Administration record filed on September 10, 2013 (docs. 13, 14).  Moreover, the page numbers refer to those found on the lower right-hand corner of each page of the transcript, as opposed to those assigned by the court's electronic docketing system or any other page numbers that may appear.

[2] In its March 21, 2013, Notice, the AC stated that it had considered several letters Plaintiff submitted from her family and friends, all of which are dated in February 2013, and which the AC made a part of the administrative record (see tr. 2, 5).  The AC noted that Plaintiff had also submitted medical evidence from Panhandle Orthopaedics, dated December 5, 2011, through August 16, 2012.  The AC stated that because the evidence post-dated the ALJ's November 21, 2011, decision it was not relevant to the appeal before it; the AC thus returned the Panhandle Orthopaedics evidence to Plaintiff for use in any new application she might later wish to file (id.).  In the instant proceeding, Plaintiff notes, but has not specifically challenged, the AC's determination (see doc. 18 at 2) or attempted to submit the Panhandle Orthopaedics evidence to the court.

[3] Thus, the time frame relevant to Plaintiff's claim for DIB is March 25, 2008 (date of alleged onset), through November 21, 2011 (date of ALJ's decision), even though Plaintiff was insured through June 2014 (date last insured). The time frame relevant to her claim for SSI is June 2, 2010 (date Plaintiff applied for SSI) through November 21, 2011 (date of ALJ's decision).  See Moore v. Barnhart, 405 F.3d 1208, 1211 (11th Cir. 2005) (indicating that SSI claimant becomes eligible to receive benefits in the first month in which she is both disabled and has an SSI application on file).  Accordingly, the focus of court's review in this case is on the evidence related to the period between March 2008 and November 2011.

(b)     Plaintiff has not engaged in substantial gainful activity since March 25, 2008, the alleged onset date.

(c)     Plaintiff has the following severe impairments: osteoporosis; back injury; degenerative joint disease of the back, knee and neck; kidney trouble; fibromyalgia; and hypertension.

(d)     Plaintiff does not have an impairment or combination of impairments that meets or medically equals the severity of a listed impairment.

(e)     Plaintiff has the residual functional capacity ("RFC") to perform light work, except she must avoid the hazards of working around heights and machinery.[4]

(f)     Plaintiff is capable of performing her past relevant work as a tax preparer, insurance assistant, and telemarketer.  This work does not require the performance of work-related activities precluded by Plaintiff's RFC.

(g)     Plaintiff has not been under a disability, as defined in the Act, from March 25, 2008, through November 21, 2011, the date of the ALJ's decision.

## III.     STANDARD OF REVIEW

Review of the Commissioner's final decision is limited to determining whether the decision is supported by substantial evidence from the record and was a result of the application of proper legal standards.  Carnes v. Sullivan, 936 F.2d 1215, 1218 (11th Cir. 1991) ("[T]his Court may reverse the decision of the [Commissioner] only when convinced that it is not supported by substantial evidence or that proper legal standards were not applied."); *see also* Lewis v. Callahan, 125 F.3d 1436, 1439 (11th Cir. 1997); Walker v. Bowen, 826 F.2d 996, 999 (11th Cir. 1987).   "A determination that is supported by substantial evidence may be meaningless . . . if it is coupled with or derived from faulty legal principles."  Boyd v. Heckler, 704 F.2d 1207, 1209 (11th Cir. 1983),

---

[4]  Light work is defined in 20 C.F.R. §§ 404.1567(b) and 416.967(b) as follows:

Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds.  Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls.  To be considered capable of performing a full or wide range of light work, you must have the ability to do substantially all of these activities. If someone can do light work, we determine that he or she can also do sedentary work, unless there are additional limiting factors such as loss of fine dexterity or inability to sit for long periods of time.

*superseded by statute on other grounds as stated in* Elam v. R.R. Ret. Bd., 921 F.2d 1210, 1214 (11th Cir. 1991).  As long as proper legal standards were applied, the Commissioner's decision will not be disturbed if in light of the record as a whole the decision appears to be supported by substantial evidence. 42 U.S.C. § 405(g); Falge v. Apfel, 150 F.3d 1320, 1322 (11th Cir. 1998); Lewis, 125 F.3d at 1439; Foote v. Chater, 67 F.3d 1553, 1560 (11th Cir. 1995).  Substantial evidence is more than a scintilla, but not a preponderance; it is "such relevant evidence as a reasonable person would accept as adequate to support a conclusion."  Richardson v. Perales, 402 U.S. 389, 401, 91 S. Ct. 1420, 1427, 28 L. Ed. 2d 842 (1971) (quoting Consolidated Edison Co. v. NLRB, 305 U.S. 197, 59 S. Ct. 206, 217, 83 L. Ed. 126 (1938)); Lewis, 125 F.3d at 1439.  The court may not decide the facts anew, reweigh the evidence, or substitute its judgment for that of the Commissioner.  Martin v. Sullivan, 894 F.2d 1520, 1529 (11th Cir. 1990) (citations omitted).  Even if the evidence preponderates against the Commissioner's decision, the decision must be affirmed if supported by substantial evidence.  Sewell v. Bowen, 792 F.2d 1065, 1067 (11th Cir. 1986).

The Act defines a disability as an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A).  To qualify as a disability the physical or mental impairment must be so severe that the claimant is not only unable to do her previous work, "but cannot, considering [her] age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy."  *Id.* § 423(d)(2)(A).  Pursuant to 20 C.F.R. § 404.1520(a)–(g),[5] the Commissioner analyzes a disability claim in five steps:

1.      If the claimant is performing substantial gainful activity, she is not disabled.

2.      If the claimant is not performing substantial gainful activity, her impairments must be severe before she can be found disabled.

---

[5] In general, the legal standards applied are the same regardless of whether a claimant seeks DIB or SSI, but separate, parallel statutes and regulations exist for DIB and SSI claims (*see* 20 C.F.R. §§ 404, 416).  Therefore, citations in this Order should be considered to refer to the appropriate parallel provision.  The same applies to citations of statutes or regulations found in quoted court decisions.

3.      If the claimant is not performing substantial gainful activity and she has severe impairments that have lasted or are expected to last for a continuous period of at least twelve months, and if her impairments meet or medically equal the criteria of any impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1, the claimant is presumed disabled without further inquiry.

4.      If the claimant's impairments do not prevent her from doing her past relevant work, she is not disabled.

5.      Even if the claimant's impairments prevent her from performing her past relevant work, if other work exists in significant numbers in the national economy that accommodates her RFC and vocational factors, she is not disabled.

The claimant bears the burden of establishing a severe impairment that keeps her from performing her past work.  20 C.F.R. § 404.1512.  If the claimant establishes such an impairment, the burden shifts to the Commissioner at step five to show the existence of other jobs in the national economy which, given the claimant's impairments, the claimant can perform.  MacGregor v. Bowen, 786 F.2d 1050, 1052 (11th Cir. 1986).  If the Commissioner carries this burden, the claimant must then prove she cannot perform the work suggested by the Commissioner.  Hale v. Bowen, 831 F.2d 1007, 1011 (11th Cir. 1987).

IV.    PLAINTIFF'S PERSONAL HISTORY

Plaintiff was born on October 21, 1958 (see tr. 293).  Thus she was forty-nine years of age on her alleged disability onset date of March 25, 2008, and fifty-three years of age at the time of her November 2, 2011, administrative hearing (tr. 41).  Plaintiff has a two-year college degree in paralegal studies (tr. 41–42, 357) and, as noted by the ALJ, past relevant work as a tax preparer, insurance assistant, and telemarketer (tr. 55).  A Report of Contact form from the Office of Disability Determinations dated July 7, 2010, reflects that Plaintiff reported she took medication for her back, fibromyalgia, kidney, and hypertension conditions and was under the care of a chiropractor (tr. 171).  Plaintiff stated that her children did most of the household chores but that she was able to take care of her personal hygiene, prepare simple meals, and drive a car (id.).

V.      HEARING TESTIMONY

Plaintiff testified at the administrative hearing that for many years she had suffered from a severe back condition but that the condition worsened significantly after she sustained a fall in March 2010 (tr. 43).  She stated that she also suffers from osteoporosis and fibromyalgia and has problems with her neck, hips, and knees (*id.*).  According to Plaintiff, her conditions cause pain so severe that she is unable to concentrate or care for herself independently (*id.*).  Plaintiff also told the ALJ that she had not received necessary medical services because she has no health insurance (tr. 44), although when asked by her attorney she acknowledged that recently she had been treated regularly at a community clinic (tr. 53–54).

When questioned by the ALJ as to which part of her body was the most painful, Plaintiff responded, "my entire body" (tr. 44).  She said she had "learned to kind of deal with" constant pain from fibromyalgia "over the years" after being diagnosed with that condition in 2002, but that pain from her back and knees since her March 2010 fall was so severe—which she rated as being a "9" out of "10," with 10 being the most severe pain—she could hardly walk (tr. 45–46).  Walking, sitting, and standing made her pain worse; Plaintiff described herself as being "totally dysfunctional" and "basically homebound" (tr. 46), and she indicated her pain had "increased severely" over the past year (tr. 47).  Plaintiff stated that she took pain medication but that it "just kind of calms [her] down a little" (*id.*).  She could eat, go to the bathroom, and shower by herself but had not shopped for groceries or cooked in over ten years (tr. 48).  She did no housekeeping (*id.*).  When asked how far she would be able to walk down the street from her front door, Plaintiff responded that she "couldn't make it a foot" (tr. 49).  She thought she could stand up for ten to fifteen minutes, with her back pressed against a wall; sit for about thirty minutes before needing to rise; and lift no more than eight pounds (*id.*).  She could not push or pull heavy items, bend over, or climb a few steps without help (tr. 50).  Plaintiff stated that in a twenty-four hour period she needed to lie down at least twenty hours to relieve her pain (tr. 54).

The VE testified that Plaintiff's past work as a tax preparer was classified as sedentary and skilled; her past work as an insurance assistant was sedentary and semi-skilled; and her past work as a telemarketer was sedentary and semi-skilled (tr. 55).  In response to the ALJ's hypothetical question describing an individual of Plaintiff's age, education, and vocational history who could perform a full

range of sedentary to light work (but who needed to avoid dangerous machinery and heights), the VE responded that such an individual could perform Plaintiff's past work as well as certain other jobs (tr. 55–56).  The VE was then questioned by Plaintiff's counsel, who asked the VE to consider a hypothetical person who was the same age as Plaintiff and had the same educational and vocational background (tr. 57).  The VE should assume, however, that all of the testimony given by Plaintiff was fully credible and applicable to the individual and that due to extreme pain the individual would have marked breakdowns and be unable to maintain concentration, persistence, and pace (*id.*).  The VE responded that such an individual could not perform Plaintiff's past relevant work and that there were no other jobs in the local and national economies the person would be able to perform (tr. 57).

VI.     RELEVANT MEDICAL HISTORY

Before outlining Plaintiff's medical history the court addresses the manner in which Plaintiff responded in her amended memorandum (doc. 18) to the court's September 13, 2013, Scheduling Order (doc. 15) and its November 19, 2013, Order instructing Plaintiff to file an amended memorandum (doc. 17).  As stated above, Plaintiff proceeds pro se in this case, which status the court recognized in its Orders.  Although the court advised Plaintiff that it must construe her pro se filings liberally and hold them to a less stringent standard than those drafted by attorneys, it also cautioned her that the court was not required to rewrite deficient pro se filings and that pro se litigants were required to follow all procedural rules (*id.*).  The court also directed Plaintiff, indeed instructed her emphatically, that her memorandum in support of the complaint must "set forth [her] legal contentions and specifically cite the record by page number for factual contentions" (*id.* at 2, emphasis in original).  Plaintiff was cautioned that the failure "to support factual contentions with accurate, precise citations to the record would result in the contention(s) being disregarded for lack of proper development" (*id.*, emphasis in original).  At 859 pages, Plaintiff's SSA file in this case is voluminous, and approximately 636 pages of the file are medical records.  Despite the court's instructions that she must clearly identify her legal contentions and cite the record by page number for factual contentions—instructions of particular importance in a case with a record as large as the one here—Plaintiff's legal arguments before the court are not easily discerned and, especially in the

"Issues"/argument section of her memorandum, she cites the record only infrequently.[6]  Nevertheless, in an effort not to prejudice the pro se Plaintiff even though she did not comply adequately with the court's instructions, the court has conducted a summary review of the record, an outline of which follows,[7] and has made its best effort to identify and understand her legal arguments.

Physical Impairments

The administrative transcript contains certain medical records for the period prior to Plaintiff's alleged onset date of March 25, 2008.  These records include an August 2006 x-ray of the cervical spine that revealed no acute fracture or subluxation (tr. 281); a December 2006 computerized tomography ("CT") scan of the cervical spine that revealed mild or moderate degenerative changes but no acute pathology (tr. 293); a December 2006 CT scan of the lumbar spine that showed minor degenerative spurring but no acute pathology (tr. 294); a December 2006 CT scan of the left shoulder that revealed minor cortical irregularity along the superior surface of the acromion consistent with normal variant (*id.*); and a November 2007 magnetic resonance imaging ("MRI") of the lumbar spine that revealed mild degenerative changes with slight encroachment on the L5-S1 foramina, right more than left, but no significant disc protrusion or spinal canal stenosis (tr. 353).

In April 2008—the month after Plaintiff alleged she became disabled—an MRI of Plaintiff's lumbar spine showed minor changes of spondylosis at the facets posterior, particularly in the lower lumbar region, and minor bulging in the L5-S1 disc; the study was otherwise normal (tr. 377).  Also in April 2008, an MRI of the cervical spine showed mild changes of cervical spondylosis, with no evidence of disc protrusion or other pathology (tr. 378).  Radiographs obtained in July 2008 of both of Plaintiff's knees revealed minor degenerative spurring with no acute pathology (tr. 379).

Urologists H. J. Martin, M.D., and J. M. Plunkett, M.D., treated Plaintiff from July 2008 to December 2008 for urinary calculi and urine retention (tr. 360–70; *see also* tr. 382–498).  Plaintiff

---

[6]  Also, at thirty pages, Plaintiff's memorandum exceeds the twenty-five pages permitted in the court's Scheduling Order (doc. 15 at 2).  To the extent it is necessary, the court grants Plaintiff leave to file her over-long memorandum.

[7]  By summary review, the court means that it has paged through the medical record and in its restatement of the facts it has given the greatest attention to those documents that appear to be relevant to Plaintiff's claims for benefits and little or no attention to those documents that do not.  Therefore, in its instant review the court does not, indeed cannot in a record of this size, mention or rely on every document, much less every entry of every document.

was diagnosed with a left ureteral calculus and left ureterocele, which were surgically removed in August 2008 (tr. 532–33).  When Plaintiff complained of flank pain, a CT scan of her abdomen and pelvis in October 2008 revealed no stones within the renal collecting system, no evidence of hydronephrosis, and no inflammatory changes within the mesentery (tr. 430).  In December 2008, Dr. Martin reported that Plaintiff had experienced problems with urine retention post-surgery but was currently able to empty her bladder completely, although he indicated that she would need silver nitrate treatment at two-to-three month intervals for urine retention for the indefinite future (tr. 360).

In September 2008 Plaintiff complained of left knee pain to Arineta Speer, M.D., for which pain Dr. Speer prescribed medication (tr. 376).  Dr. Speer diagnosed Plaintiff with low back pain in September and October 2008 (tr. 375, 376), and she prescribed numerous medications, including Valium, Lortab, Flexeril, and Gabapentin (*see* tr. 375).  Dr. Speer's assessments in December 2008, February 2009, April 2009, and June 2009 included osteoarthritis, myalgias, depression, muscle spasm, and back pain, for which Dr. Speer continued to prescribe various medications (*see* tr. 539–542).

Plaintiff presented to the West Florida Hospital emergency room on July 12, 2009, with complaints of right lower toothache and jaw pain with swelling of the jaw; Plaintiff reported that her pain was 10/10 (tr. 801).  Dental decay was noted; Plaintiff was prescribed an antibiotic and Lodine, a nonsteroidal anti-inflammatory drug ("NSAID") used for pain relief (*id.*).

In August 2009 Dr. Speer diagnosed Plaintiff with non-insulin dependent diabetes mellitus (tr. 536).  In October 2009 Dr. Speer's diagnoses included back and knee pain, myalgias, elevated blood pressure, and non-insulin dependent diabetes mellitus (tr. 535).  A November 2009 DEXA scan revealed normal bone mineral density (tr. 548).

In December 2009 Plaintiff presented to the emergency room of Sacred Heart Hospital complaining of left knee pain (tr. 508).  Plaintiff exhibited pain on active and passive range of motion, and she refused to bend the knee or permit it to be bent; otherwise, the examination was generally unremarkable (tr. 511).

In February 2010 Dr. Speer diagnosed Plaintiff with myalgias, back pain, and mild degenerative disc disease of the lumbar spine and renewed Plaintiff's prescriptions (tr. 538).  Dr.

Speer's diagnoses in April 2010 included osteoarthritis, myofascial pain, and myalgia, and Dr. Speer again renewed most of Plaintiff's prescriptions (tr. 534).

Following a fall in March 2010,[8] Plaintiff was treated at the Sacred Heart Hospital emergency room (tr. 587, 590).  An examination revealed right inguinal ligament pain but was otherwise unremarkable (tr. 501–03).  A lumbar/sacral series of radiographs was described as "normal" (tr. 590), revealing mild changes of vertebral spondylosis, straightening of the normal lordosis, mild grade I posterior subluxation of L5 on S1, and mild osteoarthritic changes to both hips (tr. 579, 659, 660).  Plaintiff also underwent a cervical spine series of x-rays, which were described as a "negative study" (tr. 656–57).  An MRI of the lumbar spine taken in April 2010 revealed "[n]o specific MR abnormality" (tr. 658).  Additionally, Plaintiff was seen several times at the Sacred Heart emergency room in April 2010 for back pain with sciatica (tr. 556, 567, 576).  Notes reflect that Plaintiff had presented to the emergency room on a "near monthly" basis requesting pain medication and had been advised that she would not be dispensed narcotics for chronic pain (*see* tr. 557, 559, 569).  The report of Plaintiff's April 25, 2010, emergency room visit, when she presented via an emergency medical services stretcher, reflects her complaint of back pain that was 10/10 (tr. 556).  It also reflects diagnoses of unspecified drug dependence, other drug-seeking behavior, chronic pain, and low back pain/lumbago (tr. 559).  In May 2010 Plaintiff presented with complaints of head and back pain (tr. 601).  A physical examination was unremarkable (tr. 602, 604).  A CT scan of the head was advised, which Plaintiff initially refused out of a reported fear of radiation (tr. 604).  Plaintiff began "thrashing her extremities without purposeful movement wanting something for pain," but she was told she would not be given any pain medication until the CT was performed (*id.*).  It was noted that Plaintiff "comes here regularly seeking narcotics and has been seen by a pain [management] MD and has been fired by that MD for noncompliance" (*id.*).  Plaintiff eventually agreed to submit to a CT scan of her head, which revealed normal results (tr. 614).

---

[8] Plaintiff states in her memorandum that she fell on March 16, 2010, due to a spill of "pain[t] in front of my apartment.  As I stepped out of my apartment on to the wet paint, I went up in the air and I came down on my left side onto my concrete porch." (doc. 18 at 7).  On the date of the accident, however, Plaintiff appears to have described the incident somewhat differently to emergency medical personnel.  She is quoted as stating that she had been "trying to walk up stairs.  Pt states she did not get dizzy, just missed step. . . ." (tr. 500).

Plaintiff was seen at the Sacred Heart Hospital emergency room again in June 2010, complaining of pain that was 10/10; she reported that she had fallen on her tail bone in March and "noticed she could not sit on her tail bone in May" (tr. 630). Examination of the back was normal, with midline tenderness in the coccygeal area (tr. 632). The record describes Plaintiff's pain as chronic, and she was discharged with the advice to follow up with chronic pain management treatment (*id.*).

From June 2010 to September 2010 chiropractor Brandon Baldwin, D.O., treated Plaintiff with various modalities for pain, including acupuncture, manual therapy, manipulation, and mobilization (*see* tr. 639–83, 711–41, 756–76). On November 1, 2010, Dr. Baldwin prepared a narrative report pertaining to Plaintiff's condition following her March 2010 fall (tr. 781–86). Dr. Baldwin noted that Plaintiff had a history of a previous worker's compensation injury to her low back and complaints of numerous medical problems[9] (tr. 781). Based on his review of Plaintiff's medical records, including the radiographic examinations and non-weight-bearing MRIs performed at Sacred Heart Hospital in March and April 2010; weight-bearing MRIs of the cervical and lumbar spine performed in September 2010 by David L. Harshfield, Jr., M.D., in Tallahassee, Florida[10]; and his own physical examination, Dr. Baldwin diagnosed Plaintiff with "multiple levels of ligament, disc, and facet capsular damage" (tr. 785). More specifically, he noted that Plaintiff's injuries to the upper cervical spine were "very significant" due to their location near the brain stem and that Plaintiff had a broken coccyx[11] and wrist and knee sprains (*id.*). Dr. Baldwin also concluded that Plaintiff had signs, symptoms, and a history consistent with a mild traumatic brain injury and cerebellar ectopia, and he diagnosed her with temporomandibular joint ("TMJ") disorder consistent with trauma (*id.*). Dr. Baldwin opined that

---

[9] Plaintiff complained of neck, back, bilateral shoulder, left arm, wrist, buttock, tail bone, left knee, calf, and foot pain (tr. 781). Plaintiff also reported neck stiffness, sleeping problems, nervousness, tension, irritability, chest pain, dizziness, pins and needles in her arms and legs, shortness of breath, fatigue, depression, memory loss, ringing and buzzing in the ears, loss of balance, and constipation; she also felt as if her "'rectum was being pulled out of her vagina'" and had experienced bilateral jaw pain and headaches during the course of treatment (*id.*).

[10] Dr. Baldwin states in his report that Plaintiff was sent for weight-bearing MRIs of her cervical and lumbar spines after conservative treatment for her injuries had resulted in little progress (tr. 782).

[11] Dr. Baldwin commented that although the Sacred Heart report of the radiographs taken of Plaintiff's hips stated there were no fractures, his "over read" of the radiographs had detected a fractured coccyx (tr. 782).

Plaintiff's injuries were painful, permanent, and would progress over time; she could no longer move without a cane; and she was unable to perform household chores or work a normal job (*id.*).

Dr. Harshfield's report of Plaintiff's weight-bearing MRI of the cervical spine, on which Dr. Baldwin relied, reflects the following objective observations (tr. 758–65).[12] Lordosis of the cervical spine was normal (tr. 764). There was marked hypertrophy of the atlantodental articulation with posterior capsulosynovial proliferation producing encroachment in to the anteroposterior dimension of the central spinal canal below the foramen magnum, with frank cord effacement (*id.*). The hypertrophic changes extended inferiorly along the posterior longitudinal ligament, predominantly in the midline. There was also attenuation of several of the key elements of the ligamentous and membranous static mechanism of the cervico-occipital junction, loss of the normal anatomic relationship of C1 and C2, and encroachment by the cerebellar tonsils on the foramen magnum without high-grade Chiari malformation (*id.*). In addition, Dr. Harshfield noted anterolisthesis of C4 on C5, widening of the posterior disc space heights at C4-5 and C5-6, widening of the interspinous intervals at the C4-5 and C5-6 levels, paradoxical lordosis to flexion stress of the cervico-thoracic discovertebral segments (indicating a guarding mechanism), decreased mobility of the C0-1-2-3 levels, and relative immobility of the discovertebral segments of the cervico-occipital junction/cervico-thoracic junction to extension stress (tr. 764–65).

In his report of Plaintiff's weight-bearing MRI of the lumbar spine (tr. 706–710), on which Dr. Baldwin also relied, Dr. Harshfield noted that there was loss of normal lordosis and evidence of facet hypertrophy accompanied by developing collisional lesions of the pars interarticularis along the lower lumbar levels, with associated discopathy and canal stenosis (tr. 710). At L4-5, there was a loss of disc space height, as well as rostral caudal subluxation, hypertrophy of the facets, and bi-foraminal narrowing (tr. 707). Additionally, there was sclerosis of the pars interarticularis bilaterally, partial effacement of the perineural fat planes surrounding the intracanalicular portions of the exiting L4 nerve rootlets and the extraformainal portions of the traversing L5 nerve rootlets, and atrophic changes of

---

[12] In his reports of Plaintiff's cervical and lumbar weight-bearing MRIs, Dr. Harshfield made extensive, detailed medical observations concerning Plaintiff's condition, which are summarized *infra*. Dr. Harshfield also made numerous comments of general or potential application, which are not included here because they do not speak to Plaintiff's particular circumstances.

spinal musculature (*id.*).  There was no demonstrable pathologic anteriolisthesis or retrolisthesis to flexion stress (tr. 710).  The lumbosacral junction demonstrated paradoxical lordosis to flexion stress, decreased mobility of the thoracolumbar segments to flexion stress, and relative immobility of the discovertebral segments of the thoracolumbar and lumbosacral junctions to extension stress (*id.*).

Plaintiff presented to the West Florida Hospital emergency room in December 2010 with complaints of low back pain that radiated into the hips, which pain Plaintiff described as "moderate" in degree (tr. 789).  Range of motion of the cervical spine was noted to be "painless" and "inspection" of the back was "normal," with no vertebral point tenderness, soft tissue tenderness, or costovertebral angle tenderness (tr. 790).  The clinical impression was degenerative joint disease and chronic back pain of the lumbar spine with no motor weakness and no sensory deficit (*id.*).

Plaintiff was seen at the Escambia Community Clinics several times between February 2011 and September 2011, for complaints of pain and other conditions (tr. 848–59).  The assessments/plans included unspecified backache, cervicalgia, and enthesopathy[13] in February 2011 (tr. 859); prophylactic hormone replacement and internal derangement of the knee[14] in August 2011 (tr. 856); and cervicalgia and unspecified backache twice in September 2011 (tr. 850).  On October 3, 2011, Plaintiff underwent an MRI of her lumbar spine (tr. 832).  The MRI revealed a minimal right paracentral protrusion at T12-L1, with no nerve root compression; the appearance of the remaining lumbar discs was described as "normal" (*id.*).  An MRI of the cervical spine showed Plaintiff's cervical cord was normal in appearance; the cervico-medullary and cervico-thoracic junctions were intact (*id.*).  There was prominence of the posterior longitudinal ligament at C2 and C3 but no focal disc protrusion, and minimal disc bulging at C5-6 and C6-7 with no cord or nerve root compression at any level (*id.*).

---

[13]  Enthesopathy is defined as "[a] disease process occurring at the site of insertion of muscle tendons and ligaments into bones or joint capsules."  http://www.medilexicon.com/medicaldictionary.php?s=enthesopathy (last visited September 17, 2014).

[14]  Flexion and extension of the left knee were painful, but other signs were negative; radiographs revealed mild degenerative joint disease (tr. 856). The nurse practitioner who examined Plaintiff noted that she was wearing a brace on the left knee but said he was "unsure why as exam and Xray [were] essentially normal" (*id.*).

On October 5, 2011, orthopedist C.W. Koulisis, M.D., conducted a consultative examination (tr. 834–46). Dr. Koulisis' physical examination of Plaintiff's knees revealed no effusion bilaterally; normal patellofemoral mechanics throughout the range of motion bilaterally; stability to all stresses including anterior, posterior drawer, Lachman's, and varus/valgus; and negative Apley's grind and McMurray's test (tr. 836). Range of motion, however, was limited to 130° (tr. 839). Dr. Koulisis opined that Plaintiff did not require a cane to ambulate (tr. 842), and he noted that Plaintiff's Waddell's signs were 5/5.[15] Dr. Koulisis reported that Plaintiff walked stooped forward, and she refused to heel/toe or tandem walk but could rise without difficulty and upon standing had normal cervical lordosis, thoracic kyphosis, and lumbar lordosis. Plaintiff had a negative Spurling's test,[16] her motor strength was 5/5, and her reflexes were normal. Dr. Koulisis stated that on examination Plaintiff maintained range of motion passively, and she was neurologically intact. "Her strength was breakaway but with repeated testing it is 5/5. Again[,] she exhibits significant pain behaviors." (tr. 837). The range of motion studies form completed by Dr. Koulisis shows normal range of motion in all joints, other than the knees (tr. 838–40). Dr. Koulisis' impression was "1. complaints of low back pain[;] 2. marked pain behaviors (Waddell's 5/5)[; and] 3. smoking co-morbidity" (tr. 837).

Dr. Koulisis also completed a Physical Capacities Evaluation, in which he opined that Plaintiff could lift and carry up to 100 pounds (tr. 841). In addition, both with respect to uninterrupted periods and to a full workday, she could sit for eight hours, stand for eight hours, and walk for eight hours (tr. 842). She did not require a cane to ambulate (*id.*). Plaintiff had no restrictions with respect to use of her hands or feet or climbing, balancing, stooping, kneeling, crouching, and crawling (tr. 844). She also had no restrictions regarding operating a vehicle or exposure to unprotected heights, humidity and

---

[15] The Waddell test consists of five signs of nonorganic sources of lower back pain. Positive signs may suggest that malingering or psychological conditions, rather than physical conditions, are the source of the asserted pain. *See* Wick v. Barnhart, 173 F. App'x 597, 598–60 (9th Cir. 2006) (stating that the Waddell test "does not distinguish between malingering and psychological conditions") (citing Gordon Waddell et al., Nonorganic Physical Signs in Low–Back Pain, 5 Spine 117, 117–25).

[16] Spurling's test is an "evaluation for cervical nerve root impingement in which the patient extends the neck and rotates and laterally bends the head toward the symptomatic side; an axial compression force is then applied by the examiner through the top of the patient's head; the test is considered positive when the maneuver elicits the typical radicular arm pain." http://www.medilexicon.com/medicaldictionary.php?t=90833 (last visited September 17, 2014).

wetness, polluted air and fumes, extremes of cold and heat, vibrations, very loud noise, or moving mechanical parts (tr. 845).

<u>Mental Impairments</u>

Susan A. Danahy, Ph.D., conducted a consultative psychological evaluation of Plaintiff on July 31, 2008 (tr. 355–59).  Plaintiff reported to Dr. Danahy that she had injured her back at work on July 18, 2001 (tr. 356).  Dr. Danahy reported that Plaintiff presented herself as "enormously crippled," walking with a cane, laboring over even the smallest steps, wincing frequently, and moving her arms stiffly (tr. 355).  Dr. Danahy described Plaintiff as a very difficult person to interview, as each question "led to long circumstantial answer to the point that she was repeating word for word conversations about things that had nothing to do with her current disability situation" (*id.*).  Nevertheless, Plaintiff was "completely oriented" during the interview and her memory appeared to be intact (tr. 357).  She seemed depressed (*id.*) and was often tearful talking about her problems (*id.*).  The "most dramatic thing about [Plaintiff's] presentation was her pain behavior, including her terrible gait, discomfort sitting in her chair, and stiffness in most of her motions" (*id.*).  Dr. Danahy described Plaintiff's mental status as, overall, intact, with only mild difficulty with concentration (*id.*).  Dr. Danahy's diagnostic impressions were adjustment disorder with depressed mood vs. pain disorder associated with orthopedic pain and depression; history of treatment for crack cocaine dependence, reportedly in long-term sustained remission; and a global assessment of functioning ("GAF") score of 52.[17]  In summary, Dr. Danahy stated that Plaintiff suggested her pain problems were the primary issue to be considered in determining disability (tr. 358).  Dr. Dahany's impression was that Plaintiff's complaints of some anxiety and depression were secondary to her physical problems rather than a separate problem (*id.*).

---

[17]  GAF is the overall level at which an individual functions, including social, occupational, academic, and other areas of personal performance.  American Psychiatric Association, <u>Diagnostic and Statistical Manual of Mental Disorders</u> 30–32 (4th ed. 1994) ("<u>DSM–IV</u>").  It may be expressed as a numerical score.  *Id.* at 32.  A score between 51 and 60 reflects moderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) or moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers or co-workers).  *Id.*

Plaintiff was seen at the Lakeview Center in December 2008, when she reported long-term issues with depression and anxiety (tr. 372–73). Plaintiff was described as alert and oriented, with a depressed mood and constricted range of affect (tr. 373). Her memory was intact, and her attention and concentration were fair to poor (*id.*). Her intellect was estimated to be average, her judgment fair, and her insight moderate (*id.*). Delusion and psychosis were not evident (*id.*). Plaintiff's thought processes were rambling and circumstantial, and she was "hyperverbal" (*id.*). Her motor activity was "retarded," and she used a wheelchair during the interview (*id.*). The content of Plaintiff's thought revealed some worthless and hopeless feelings (*id.*). Her diagnoses were major depressive disorder, recurrent, unspecified; cocaine dependence, in full sustained remission; and a GAF score of 48.[18]

Steve Hirschorn, Ph.D., performed a consultative psychological examination of Plaintiff in September 2010 (tr. 693–95). Plaintiff reported that she had no psychiatric symptoms until 2001, when she hurt her back; since then she had experienced chronic, severe pain which she rated as 9 daily on a scale of 1 to 10. Dr. Hirschorn described Plaintiff has being "depressed, the stress of being in pain and her future" (tr. 695). Plaintiff's

> presentation was noteworthy for the degree of pain that she was experiencing. Although she only rated it as a 9 it seemed much more severe as she continually grimaced and even had difficulty talking due to TMJ. As she walked and sat she continually contorted but apparently [that] was not of much help. She is unable to have any medications [due to lack of insurance and finances]. In the past they were helpful. Even though she is depressed it is thought that her chronic pain is much more of an obstacle to employment.

(*id.*).

Dr. Hirschorn's diagnosis was adjustment disorder with mixed anxiety and depressed mood; major depression, single incident, without psychotic features; pain disorder associated with both psychological factors and general medical condition; cocaine abuse, reported full sustained remission; nicotine dependence; and GAF score of 51.

---

[18] A GAF score between 41 and 50 indicates "[s]erious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) OR any serious impairment in social, occupational, or school functioning (e.g., no friends, inability to keep a job)." DSM-IV at 32.

Plaintiff presented to the Lakeview Center in February 2011 to request assistance with symptoms of depression and anxiety (tr. 830).  She remained in a wheelchair throughout the assessment, and she was observed experiencing "intense pain [and] cringing, shifting seated positions, standing for a short period of time to relieve the pressure on her tail bone" and having difficulty moving (tr. 830–31).  Plaintiff's symptoms were described as "valid" but most likely related to injuries to her back sustained in 2001 and 2009,[19] which Plaintiff reported had resulted in  "loss of job, loss of her home, and loss of her identity in the business/community world" (tr. 831).  Plaintiff also stated that she felt guilty due to her daughter's postponing college to care for her (*id.*).  Plaintiff was diagnosed with mood disorder and cocaine dependence in sustained full remission (*id.*).  Plaintiff was seen again at the Lakeview Center in March 2011, when her diagnoses were mood disorder, cocaine dependence in sustained full remission, chronic pain syndrome and other medical issues, and GAF of 55 to 58 (tr. 824).

---

[19]  Plaintiff reported having injured her back in 2001 and in 2009 due to a fall (tr. 828).  Presumably, the reference to the fall in 2009 is a scrivener's error and Plaintiff was in fact referring to her March 2010 fall.

<u>Reports of Non-Examining Consultants</u>

Debra Troiano, M.D., a State consultant, prepared a Physical Residual Functional Capacity Assessment for Plaintiff on August 25, 2010 (tr. 684–90). Based on her review of Plaintiff's medical records, Dr. Troiano determined that Plaintiff could occasionally lift and carry twenty pounds and frequently lift and carry ten pounds (tr. 685). Plaintiff could sit and stand about six hours in an eight-hour workday and had unlimited push and pull abilities (*id.*). Plaintiff could never climb ladders, ropes, or scaffolds, but she could occasionally climb ramps and stairs as well as crouch (tr. 686). Plaintiff could frequently balance, crawl, kneel, and stoop. Plaintiff had no communicative, manipulative, visual, or environmental limitations (tr. 687–88), other than having to avoid even moderate exposure to extreme cold (tr. 688). In support of the exertional limitations she imposed, Dr. Troiano noted that diagnostic studies of Plaintiff's hips, knees, shoulder, back (including the coccyx), and neck reflected only mild or normal findings (tr. 685–86). Also, Plaintiff's renal function currently was normal, there was no end-organ damage despite hypertension that was not ideally controlled, and in the available record there was no definite diagnosis of fibromyalgia (tr. 686). According to Dr. Troiano, Plaintiff had medically determinable impairments ("MDIs") and moderate functional limitations, but her subjective complaints far outweighed the clinical evidence (tr. 689). Plaintiff's "clinical evidence supports Sacred Heart['s] exams" from June 2010[20] rather than the information supplied in "her chiropractor's notes," which notes Dr. Troiano (and, later, the ALJ) described as being "in contrast" with the Sacred Heart evidence (*id.*; *see also* tr. 29).

On September 23, 2010, State consultant Robert F. Schilling, Ph.D., prepared a Psychiatric Review Technique form for Plaintiff (tr. 742–55). Dr. Schilling opined that Plaintiff had the following MDIs, none of which precisely satisfied the diagnostic criteria to establish disability: affective disorder (dysthmia) (tr. 745); anxiety-related disorder (adjustment order with anxiety) (tr. 747); somatoform disorder (pain disorder associated with both psychological factors and general medical condition) (tr. 748); and substance addition disorder (cocaine abuse, reported full sustained

---

[20] Dr. Troiano in fact referenced Sacred Heart emergency room records from July 2010, but the court was unable to locate any records with that date. It appears that Dr. Troiano instead may have been referencing Plaintiff's June 2010 visit to the Sacred Heart emergency room (*see* tr. 630–38, recording visit on June 23, 2010, but noting that report was "prepared" July 15, 2010).

remission) (tr. 750).  With respect to Plaintiff's functional mental limitations, Dr. Schilling opined that Plaintiff had no restriction of activities of daily living; mild difficulties in maintaining social functioning; mild difficulties in maintaining concentration, persistence, or pace; and no episodes of decomposition (tr. 752).  Dr. Schilling opined that Plaintiff's statements regarding functioning were attributable to a MDI and that Plaintiff and third party statements appeared to be credible (tr. 754).  There was, however, "minimal to no loss of function associated with [Plaintiff's] mental MDIs.  [Plaintiff's] limitations are primarily due to her physical condition.  Thus, the loss of stated function related to her mental MDI is not severe.  This conclusion is supported by the clinical and functional evidence." (*id.*).

VII.    ISSUES PRESENTED

Plaintiff generally contends that it was error for the Commissioner to deny her applications for benefits because she suffers excruciating, disabling pain.  Although her specific arguments for reversal are not very clear, it appears that Plaintiff contends the ALJ erred by failing to consider her medical records dating back to 2001; by failing to afford chiropractor Brendan Baldwin's opinion great weight; in making an adverse credibility determination; and by assigning an RFC assessment that exceeds her abilities.  In response, the Commissioner argues that substantial evidence supports the ALJ's determination that Plaintiff has not established her entitlement to disability benefits.  Therefore, according to the Commissioner, her decision should be affirmed.

VIII.    DISCUSSION

Plaintiff contends that medical records from 2001, 2002, and 2004 exist which were not, but should have been, made part of the administrative transcript and considered by the ALJ (*see* doc. 18 at 25–6).  The ALJ's duty to develop the record generally requires him to develop a claimant's medical history for the twelve months preceding the month in which a disability application is filed, "unless there is a reason to believe that development of an earlier period is necessary or unless you say that your disability began less than 12 months before you filed your application."  *See* 20 C.F.R. § 404.1512(d).  Neither of these exceptions applies here.  Indeed, the records cited by Plaintiff significantly predate the relevant period in this case of March 2008 through November 2011 (*see* n.3, *supra*), and thus they are not relevant to Plaintiff's current disability applications.  In other words,

records from 2001 to 2004 are too remote to be relevant to the issue of whether Plaintiff became disabled in March 2008.  *See* Carmickle v. Commissioner, Social Security Administration, 533 F.3d 1155, 1165 (9th Cir. 2008) (stating that "[m]edical opinions that predate the alleged onset of disability are of limited relevance").  Moreover, even evidence that only slightly predates the relevant period must still tend to show that Plaintiff was disabled in March 2008 in order to be relevant to the instant applications.  For example, the 2006/2007 radiographs, CT, and MRI reports of studies of Plaintiff's cervical and lumbar spine (*see* tr. 281,  293, 294, 353)—which Plaintiff does not reference and the ALJ did not discuss—reflect only mild to moderate findings and thus are not supportive of a finding of disability during the relevant period of March 2008 to November 2011.  In short, the court concludes that the ALJ did not err by failing to develop the record to include medical records dating back to 2001 or by failing to consider such records in rendering his decision.  *See* Wilson v. Apfel, 179 F.3d 1276, 1279 (11th Cir. 1999) ("We review the decision of the ALJ as to whether the claimant was entitled to benefits during a specific period of time . . ."); *see also* Cassidy v. Comm'r of Soc. Sec. Admin., 383 F. App'x 840, 842 (11th Cir. 2010) ("The burden was on [Plaintiff] to establish his entitlement to benefits during a specific time period."); Goff ex rel. Goff v. Comm'r of Soc. Sec. Admin., 253 F. App'x 918, 922 (11th Cir. 2007) (distinguishing between medical opinions offered during the relevant time period from those that related back several years).        Plaintiff also appears to challenge the ALJ's failure to give the opinion of chiropractor Brendan Baldwin great weight.  The issue of disability is a legal issue, rather than a medical issue, and therefore it is a determination that is reserved to the Commissioner.  *See* 20 C.F.R. §§ 404.1527(d)(1), 416.927(d)(1). Under the "treating physician's rule," however, the ALJ must give substantial weight to the opinion, diagnosis, and medical evidence of a treating physician unless there is good cause to do otherwise. *See* Lewis, 125 F.3d at 1439–41; Edwards v. Sullivan, 937 F.2d 580, 583 (11th Cir. 1991); Sabo v. Chater,  955 F. Supp. 1456, 1462 (M.D. Fla. 1996); 20 C.F.R. § 404.1527(d).  Dr. Baldwin, though, is not a physician, and under the SSA's regulations he is not considered an "acceptable source."  *See* Crawford v. Comm'r, 363 F.3d 1155, 1160 (11th Cir. 2004) (citing 20 C.F.R. §§ 404.1513(a), 416.913(a), which exclude chiropractors from the list of "acceptable medical sources" whose opinions may be considered in determining the existence of an impairment).  Nevertheless, evidence

from other sources—such as chiropractors—may be used to show the severity of an impairment and how it affects a claimant's ability to work. 20 C.F.R. §§ 404.1513(d), 416.913(d).[21] If the opinion of a "non-acceptable" medical source is inconsistent with other treatment notes, however, the ALJ's failure to credit the opinion is not error. Crawford, 363 F.3d at 1160. Here, as the ALJ noted (tr. 29, 689), Chiropractor Baldwin's notes are inconsistent with the 2010 records from the Sacred Heart emergency room. The objective evidence from Sacred Heart in the months following Plaintiff's March 2010 fall in fact generally reflect normal or mild to moderate, at most, findings (see tr. 579, 590, 602, 604, 614, 632, 656–57, 658, 659, 660).

In rejecting Chiropractor Baldwin's opinion the ALJ also relied on Dr. Troiano's August 2010 opinion. Although Dr. Troiano obviously rendered this opinion without consideration of Dr. Harshfield's September 2010 MRI reports or Dr. Baldwin's November 2010 narrative report (see tr. 758–65, 706–10), the court notes that Dr. Harshfield was not a treating physician but rather a one-time examining physician whose opinion is not entitled to the same deference as that of a treating physician. See Crawford, 363 F.3d at 1160. Moreover, although Dr. Harshfield made numerous objective findings, none appear to have been described as severe in degree, and he offered no opinions or recommendations with respect to Plaintiff's functional limitations. And, importantly, subsequent objective testing of Plaintiff's cervical and lumbar spine, in the form of the October 2011 MRIs obtained at Sacred Heart, revealed only minimal findings (tr. 832). Likewise, a physical examination performed at the West Florida Hospital emergency room in December 2010 revealed only minimal findings (tr. 789–90). Further, Dr. Baldwin's November 2010 narrative report is consistent with his earlier treatment notes that Dr. Troiano did review, and the ALJ examined the entirety of Dr. Baldwin's records and also Dr. Harshfield's report. In sum, in light of the objective evidence and applicable legal principles just discussed, the court concludes that the ALJ did not err by failing to give great weight to Dr. Baldwin's disability opinion and the reports of Dr. Harshfield, nor by assigning great weight to Dr. Troiano's consultative opinion.

---

[21] The distinction between an acceptable medical source and an "other source" is that only acceptable medical sources can provide medical opinions, establish the existence of a medically determinable impairment, be considered a treating source, or have his or her opinion be entitled to controlling weight. See Social Security Ruling 06–03p. See http://www.socialsecurity.gov/OP_Home/rulings/di/01/SSR2006-03-di-01.html (last visited September 17, 2014).

The ALJ also did not err in discounting the credibility of Plaintiff's pain testimony, when he found that Plaintiff's MRIs "could reasonably be expected to cause the alleged symptoms" but that her "statements concerning the intensity, persistence and limiting effects of these symptoms are not credible to the extent they are inconsistent with" her RFC (tr. 29). In Holt v. Sullivan, 921 F.2d 1221, 1223 (11th Cir. 1991), the Eleventh Circuit articulated the "pain standard," which applies when a disability claimant attempts to establish a disability through her own testimony of pain or other subjective symptoms. The pain standard requires: (1) evidence of an underlying medical condition and either (a) objective medical evidence that confirms the severity of the alleged pain arising from that condition, or (b) that the objectively determined medical condition is of such a severity that it can be reasonably expected to give rise to the alleged pain. Holt, 921 F.2d at 1223 (internal citation omitted). If a claimant testifies as to her subjective complaints of disabling pain and other symptoms, as Plaintiff did here, the ALJ must clearly "articulate explicit and adequate reasons" for discrediting the claimant's allegations of completely disabling symptoms. Foote, 67 F.3d at 1561–62. Additionally, "'[a]lthough this circuit does not require an explicit finding as to credibility, . . . the implication must be obvious to the reviewing court.'" Id. at 1562 (quoting Tieniber v. Heckler, 720 F.2d 1251, 1255 (11th Cir. 1983)). The credibility determination does not need to cite "'particular phrases or formulations'" but it cannot merely be a broad rejection which is "'not enough to enable [the district court or this Court] to conclude that [the ALJ] considered her medical condition as a whole.'" Id. (quoting Jamison v. Bowen, 814 F.2d 585, 588–90 (11th Cir. 1987)).

Here, the ALJ identified the correct pain standard (see tr. 19–20) before articulating his reasons for finding that Plaintiff "has questionable to poor credibility" (tr. 29–30). In support of his conclusion, the ALJ referenced the findings of Dr. Troiano and Dr. Koulisis, including the Waddell's test results reported by Dr. Koulisis that suggested a nonorganic source of Plaintiff's alleged pain[22]; noted that Plaintiff had been non-compliant with prescribed medications; noted that Plaintiff attempted

---

[22] The court again notes that positive Waddell signs may indicate that malingering *or* psychological conditions, rather than physical conditions, are the source of a patient's asserted pain. *See* Wick, 173 F. App'x at 598–60. In this case, the medical evidence is insufficient to show that physical conditions are the source of the extraordinary degree of pain alleged by Plaintiff, nor do the mental assessments suggest that a psychological condition is the source.

to "make herself appear more disabled than she is"; and noted that she had exhibited drug-seeking behavior (*id.*).  As outlined above, the record substantially supports the ALJ's reasons.  Because the ALJ clearly articulated reasons for finding Plaintiff less than fully credible that are supported by the record, the ALJ did not err in making his credibility determination.  *See* Foote, 67 F.3d at1562 (a clearly articulated credibility finding with substantial supporting evidence in the record will not be disturbed by a reviewing court); MacGregor, 786 F.2d at 1054 (same).

Finally, the court concludes that the ALJ did not err in finding that Plaintiff retained the RFC to perform a limited range of light work.  Residual functional capacity is an assessment, based upon all of the relevant evidence, of a claimant's remaining ability to do work despite her impairments.  *See* Lewis, 125 F.3d at 1440.  As stated in 20 C.F.R. § 404.1545(a), it is the most a claimant can still do despite her limitations.  "It is the claimant's burden, and not the Social Security Commissioner's burden, to prove the claimant's RFC."  Pearsall v. Massanari, 274 F.3d 1211, 1217 (8th Cir. 2001).  Although the RFC determination is a medical question, it is not based only on "medical" evidence, that is, evidence from medical reports or sources; rather, an ALJ has the duty, at step four, to assess RFC on the basis of all the relevant, credible evidence of record.  *See* Phillips v. Barnhart, 357 F.3d 1232, 1238 (11th Cir. 2004); McKinney v. Apfel, 228 F.3d 860, 863 (8th Cir. 2000) (the Commissioner must determine a claimant's RFC based on all of the relevant evidence, including the medical records, observations of treating physicians and others, and an individual's own description of his limitations); Dykes v. Apfel, 223 F.3d 865, 866–67 (8th Cir. 2000) (per curiam) (RFC is a determination based upon all the record evidence, but the record must include some medical evidence that supports the RFC finding).  *See also* 20 C.F.R. § 404.1545; Social Security Ruling 96-8p.

In this case, the ALJ adequately complied with his duty to assess Plaintiff's RFC based on the credible, relevant evidence of record.  He outlined the contents of Disability Reports made by the Office Disability Determination, including Plaintiff's statements to them concerning her physical conditions; her belief that she did not have any mental health issues but rather that severe pain prevented her from being able to work; her employment and education background; and her daily activities (tr. 20–21).  The ALJ also summarized Plaintiff's hearing testimony (doc. 21), and he discussed the medical record at length (tr. 21–29).  Based on the ALJ's extensive review of the

evidence, and its own review, the court is satisfied that substantial evidence supports the ALJ's finding that significant weight should be given to the opinion of Dr. Troiano, including her determination that Plaintiff could perform light work (tr. 29). Similarly, substantial evidence supports the ALJ's giving significant weight to Dr. Koulisis' opinion (but declining to accept Dr. Koulisis' opinion regarding Plaintiff's exertional limitations) (*id.*). Similarly, substantial evidence supports the ALJ's adoption of Dr. Schilling's opinion that Plaintiff had no severe mental impairments (tr. 28), and thus the ALJ's rejection of the diagnoses of adjustment disorder, depression, and/or pain disorder offered by Dr. Danahy, the Lakeview Center, and Dr. Hirschorn. After proceeding, properly, to discount Plaintiff's complaints of excruciating and completely disabling pain, as discussed above, the ALJ determined that Plaintiff retained the ability to perform a limited range of light work. *See* McSwain v. Bowen, 814 F.2d 617, 620 n.1 (11th Cir. 1987) (an ALJ need not include in the RFC limitations, restrictions, or opinions he has properly rejected or that are otherwise unsupported by the record). Based on the record, as outlined by the ALJ in his decision and summarized, *supra*, the court is satisfied that the ALJ's RFC determination is supported by substantial evidence on the record as a whole.

Moreover, the ALJ was entitled to rely on the VE's opinion that an individual of Plaintiff's age, education, and vocational history and who could perform a full range of sedentary to light work (but who needed to avoid dangerous machinery and heights), could perform Plaintiff's past work (tr. 55–56). As Plaintiff is able to perform a limited range of light work, she retains the ability to perform her past relevant work as a tax preparer, insurance assistant, and telemarketer, which the VE identified as positions that are sedentary in nature (tr. 55). *See* 20 C.F.R. §§ 404.1567(b), 416.967(b) (providing that an individual who can perform light work can also do sedentary work). As the ALJ was permitted to find that Plaintiff's testimony was not fully credible, he did not need to accept the VE's testimony that if Plaintiff's testimony were taken as true she could not perform her past relevant work or any other work.

IX.    CONCLUSION

For the foregoing reasons, the court finds the Commissioner's decision is supported by substantial evidence and comports with proper legal principles. The decision therefore is affirmed.

Accordingly, it is **ORDERED**:

1.      The decision of the Commissioner is **AFFIRMED** pursuant to sentence four of 42 U.S.C. § 405(g).

2.      This action is **DISMISSED,** and the clerk is directed to close the file.

At Pensacola, Florida this 25th day of September 2014.


/s/ *Elizabeth M. Timothy*
**ELIZABETH M. TIMOTHY**
**CHIEF UNITED STATES MAGISTRATE JUDGE**